IN THE MATTER OF THE APPLICATION OF JULIO A.
BRADY, as Commissioner of Insurance of the Government of
the U.S. Virgin Islands

v.

DOME INSURANCE COMPANY, INC.
In Receivership

JULIO A. BRADY, as Commissioner of Insurance and Receiver
of Dome Insurance Company, Inc.

v.

LEO BLOOM, SHIRLEY BLOOM, PHILIP BLOOM and
INTERNATIONAL FINANCIAL SERVICES, LTD.
Adversary Proceeding

Civil No. 1984/111

District Court of the Virgin Islands

Div. of St. Croix

April 17, 1985

GEORGE H. LOGAN, ESQ., c/o Office of Lt. Governor, Christiansted, St. Croix, V.I., *for receiver*

O'BRIEN, *Judge*

## MEMORANDUM OPINION

In the aftermath of the Dome Insurance Company, Inc., debacle in April 1984, Lt. Governor Julio A. Brady moved quickly to seek recovery of the monetary losses suffered by bringing this action

against members of the Bloom family and a corporation controlled by one of them. He alleged, in his capacity as Commissioner of Insurance and Receiver of Dome, that Leo Bloom, Shirley Bloom, Philip Bloom and International Financial Services, Ltd. had committed massive fraud against the people and government of the Virgin Islands. He contended that they had looted the insurance company by a variety of methods, leaving this domestic insurer an empty shell.

We agree, and a monetary judgment will enter as hereinafter indicated, in the total amount of $34,368,768.71.

## I. FACTS

As every person resident in the Virgin Islands is aware, the Dome Insurance Company, Inc. ("Dome") was placed in receivership in April 1984. Acting on the strength of an order obtained in this court, the receiver obtained the ouster of the principals of Dome and took over the company, including its records and files.

The records and documentation were a shambles. But after he sifted through them, and pieced them together with the assistance of an expert staff, the receiver discovered that there had been milking, bilking and looting of Dome's assets to a degree unparalleled in the history of the Virgin Islands. Leo Bloom, his wife Shirley Bloom and their son, Philip Bloom, had joined to systematically empty the corporate treasury, leaving more than 5,000 policyholders and hundreds of creditors and claimants in the lurch.

The lead milkman in this effort was the patriarch, Leo Bloom. A convicted felon who somehow was able to obtain approval to create Dome in the Virgin Islands and sell insurance policies to unsuspecting local residents, he rigged the pump that sucked Dome dry. We will never know the entire story of how he did it, but that he did do it cannot be disputed. The record of this case is replete with proof that in Leo Bloom we are dealing with a milkman more expert than a Wisconsin dairy farmer.

We cite one example, a "smoking gun," which proves that the looting of Dome was not the result of poor management, bad judgment or accident. And therein lies a tale.

When we ordered the principals of Dome out of the company offices, we also ordered them out of the homes that had been paid for by Dome funds. United States Marshals went with representatives of the receiver to secure these residences. At one of them, an alert (and curious) U.S. marshal noted, in a wastebasket midst the debris,

a written memorandum from Leo Bloom to his children dated August 12, 1981. At the top of the first page was this notation: "FOR YOUR EYES ONLY!".

This memorandum gave the Bloom children a step by step procedure to follow in draining funds from the company, without the transfers showing on the Dome records. The device was simple: Leo Bloom incorporated a British Virgin Islands corporation, International Financial Services, Ltd. ("IFS"), and periodically transferred money from Dome to that corporation under the guise of payment of management fees. The money then went out of the IFS account to members of the Bloom family.

We consider this memorandum such a clear demonstration of the intent to commit fraud by the Bloom family against the assets of Dome, that we attach it hereto as an appendix to this opinion. That Leo Bloom and his family succeeded in this intent will be shown all too vividly in the discussion which follows.

## II. APPLICABLE LAW

The violations of various Virgin Islands statutes involved in this case are so numerous that the receiver has his pick of applicable law, any several of which are sufficient to support his claim for damages. We provide an indication herein of a number of them.

Under Title 22, Virgin Islands Code, which regulates the insurance industry in the territory, these sections were violated:

> *Section 309*, which prohibits turning over control of an insurer to outside management.
> *Section 312*, which places strict restrictions against directors who mingle their self-interest financially with that of the corporation.
> *Section 1203*, which prohibits the filing of false financial data with the Government of the Virgin Islands.
> *Section 1204*, which prohibits false advertising in promoting insurance sales, and investments.
> *Section 1212*, which prohibits acts of misconduct by officers of an insurance corporation.

Under Title 13, Virgin Islands Code, which regulates corporate activity in the Virgin Islands, these sections were violated:

> *Section 71*, which governs loans to officers and directors of corporations.
> *Section 72*, which makes officers and directors liable for false statements about the condition of business.

366

*Section 341*, which prohibits the transfer of assets or the waste of assets by officers and directors.

At the evidentiary hearing held in this case, the receiver presented exhibits showing the false financial statements and the false advertising, and demonstrated the degree to which the Blooms had made Dome's assets their private preserve.

## III. DISCUSSION

After this adversary proceeding was filed by the receiver, the Blooms and IFS entered an answer to the complaint. But that ended their participation in the case. They refused to answer written interrogatories or produce documents on request. They refused to come to the Virgin Islands to be deposed. They conducted no discovery of their own. The Court entered repeated orders requiring compliance with the discovery rules. All were ignored. They refused to cooperate with their own attorneys, and two different sets of legal counsel were allowed to withdraw from their representation because of this lack of cooperation. The Court ordered the Blooms and IFS to enter the appearance of substitute counsel or their own pro se appearances within a stated period of time. This too was ignored. Finally, its patience exhausted, the Court ordered their answer stricken and a default entered.

A hearing on damages was held on March 27, 1985. The receiver presented proof of damages in eight separate categories, and exhibits as well as testimony were offered and received. We now take up each category separately, in the order in which the receiver presented his proof.

### (1) *Loans and Advances to Officers*

The Blooms caused $126,048.08 to be advanced out of Dome funds to one of their own, Cynthia (Cindy) diSalvo, a daughter of Leo and Shirley Bloom. This money consisted of outright advances, "loans" and more than $20,000 paid for personal American Express credit purchases. Cynthia diSalvo was originally a party to a claim by the receiver, but this matter was settled, as to her. Thus, the receiver is now free to claim reimbursement against those who actually caused the money to be advanced, namely, diSalvo's brother and her parents. They controlled Dome. They approved the transfers. Judgment in the full amount will enter against them.

367

### (2) *Payments for Real Property*

The Blooms caused four separate properties to be purchased with Dome funds, but control and title was placed in their own names, or in an entity controlled by one or more of them. The receiver claims that $447,155.12 was spent from the Dome treasury. He has recovered all the property and sold two of the four parcels.

The four parcels are Plots 212 and 213 of Estate Judith's Fancy, where Leo Bloom lived, Plot 304 of Estate Judith's Fancy, where Philip Bloom lived, Plot 44 of Estate St. John where Cynthia diSalvo lived, and the Roza Watch Co. building at Plot 6C of Estate La Grande Princesse, a commercial rental property.

Actual sums advanced by Dome for Plots 212 and 213 of Estate Judith's Fancy were $96,867.53. The property is encumbered by a mortgage securing funds loaned by Bank of America, rather than Dome. We will allow the receiver only the funds advanced, since he has not demonstrated that the property cannot pay off the mortgage, even if on sale the funds advanced are not recouped.

We take the same approach with respect to Plot 44 of Estate St. John. The receiver advanced $33,662.12 and is committed to make up arrearages and other expenses in the amount of $9,435.94. We will allow the total of these two figures, but not the additional $36,600.53 constituting the bank mortgage.

The remaining two properties have now been sold, and the net losses can be calculated. The Roza Watch Co. building loss was $129,216.31 and the loss for Plot No. 304 of Estate Judith's Fancy was $31,193.32.

■ The total awarded in this category will be $300,375.22.

### (3) *Transfers to IFS*

■ As described earlier, Leo Bloom instructed his progeny in one method of draining funds from Dome through IFS. This is the British Virgin Islands corporation he controlled. He and his children transferred a total of $1,261,185.73 to IFS and, then, presumably, to themselves or others they chose. As Leo Bloom wrote to his children in the memo quoted earlier and attached to this opinion, if his instructions were followed, "from an accounting standpoint, you will be receiving funds from International Financial Services, Ltd. and not from Dome." As can be seen, this advice was followed with enthusiasm, to the tune of $1,261,185.73, which will be allowed as part of the judgment against the Blooms.

### (4) *Certificates of Deposit from Dome*

██ In his review of the Dome files, the receiver discovered that there were holders of certificates of deposit issued by Dome in the amount of hundreds of thousands of dollars. He was able to verify $985,000.00. This is money advanced by investors to Dome on the basis of a promise to pay an attractive interest rate over the fixed period stated in the certificate. The problem for the receiver, however, is that he has been unable to trace the money into any Dome accounts. In other words, despite the fact that Dome issued the certificates, it did not receive any of the money. The largest party who advanced the money in return for the certificates is the Allied Security Health & Welfare Fund, an employee welfare fund in Long Island, N.Y. Their claim against Dome is for $540,000.00. Apparently the money was advanced after a presentation made by Leo Bloom to the fund's trustees. By mysterious coincidence, relatives of some of the persons controlling the fund received preferential loans from Dome money, traced through IFS to the recipient. The receiver is seeking return of those funds, but the other amount constituting the certificates of deposit, $985,000.00, appears to be lost forever due to the Bloom machinations. We will grant that amount as part of the judgment.

### (5) *Advances to Bloom-Controlled Companies*

██ The receiver contends that $66,000.00 was advanced to two other Bloom-controlled entities for no consideration and with no hope of return. These were Carpenter Oil Co. ($16,000.00) and Motion Picture Marketing Co. ($50,000.00). This was but another method used by the Blooms to drain funds from Dome, in a manner and to entities not permitted by Virgin Islands law. We will award the full $66,000.00.

### (6) *Yacht and Airplane for Private Use*

██ The Blooms believed strongly in maintaining a life style in keeping with the affluence they enjoyed from Dome funds. This extended to the purchase of a yacht and an airplane. The yacht, which they named the "Whiplash", and the airplane have now been sold, or authorized to be sold. The net cost to Dome after reducing the grand total by the lesser funds received or to be received, is $59,159.68, which will be allowed as part of the judgment.

### (7) *Funds Transferred to Pacific National Bank*

The name "Pacific National Bank" has the ring of solidity to it. It suggests an institution with size and expansiveness as great as the ocean whose waves slap against the western shores of the United States. It was intended to connote all these things to the public when Leo Bloom created this impressive-sounding bank.

In reality it was a mail drop in Anguilla.

There were no tellers, no vaults, no richly carpeted interiors where banking matters were discussed in hushed and respectful tones. There was only Leo Bloom and his typewriter. And, using that typewriter, he pounded out certificates of deposit in favor of Dome and against the deposits of the bank in the sum of $4,600,000.00. Thus, he announced to all, including the Government of the Virgin Islands, that Dome funds were safely in the hands of this bank, drawing interest, as regularly as the ebb and flow of the tides of the Caribbean.

Thus, from the evidence presented at the hearing, Leo Bloom typed out the certificates of deposit in favor of Dome and sent them to Anguilla, where a secretary signed them, and returned them to Leo Bloom, who placed them in Dome's files. When the receiver went to Anguilla to convert the certificates to cash, he discovered that there was no money . . . it had just as swiftly been transferred to other accounts of Leo Bloom, where it disappeared.

Until they were ousted, the Blooms had regularly reported the $4,600,000.00 of Dome on deposit with Pacific National Bank as the major asset of the corporation. This extended even to the reports filed with the Commissioner of Insurance of the Virgin Islands.

■ Leo Bloom also caused a check to be issued to Dome from his bank in the sum of $150,000.00, which, when presented for payment, was returned for lack of funds to cover it. This sum, together with the $4,600,000.00, will be awarded in favor of the receiver under this category. The receiver contends that such sums were taken from Dome by this ruse, and no evidence was received to the contrary.

### (8) *Claims Payable*

The final category is the compilation of claims against Dome by policyholders, creditors, judgment creditors, and persons who have claims against persons insured by Dome for personal injury and the like. There are sixteen sub-categories of such claims. The total has been evaluated at $26,821,000.00. Dome presented expert testimony

to the effect that the total amount of the claims filed with the receiver was $83,339,632.00. Pursuant to 22 V.I.C. § 1279, the receiver was required to evaluate each claim and place a conservative monetary value on it. After such evaluation, the receiver's expert was able to reduce the amount as shown, using a variety of adjustment techniques which appraised each contingent claim and reduced it to a fixed value. After hearing the testimony and reviewing Exhibit 11 in support of that testimony, we are satisfied that the sum of $26,821,000.00 represents a fair valuation of the claims.

The more difficult question is whether this sum can be made a part of the judgment against the defendants. In essence, is it because of the behavior of the Blooms described herein that the claims cannot be paid? After a careful review of the evidence, particularly the economic data compiled by the receiver, it is clear that "but for" the actions of the Blooms, Dome could have survived as a viable and productive, as well as profitable, insurance company.

■ However, the milking of funds was so massive, the waste was so monumental and the misuse of available money so egregious that Dome was inevitably consigned to insolvency. We rely on the authority of 13 V.I.C. § 341 to place the entire loss covered by this final category on the individual defendants. Under this statute, the receiver was permitted to bring this action on behalf of creditors, policyholders and all others who looked to Dome for payment. We believe his proof has met the test.

## SUMMARY

The total judgment to be entered in this case is the sum of the amounts covered by the eight categories as follows:

| | |
|---|---:|
| Loans and Advances to Officers | 126,048.08 |
| Real Estate Payments | 300,375.22 |
| Transfers to IFS | 1,261,185.73 |
| Certificates Issued by Dome | 985,000.00 |
| Carpenter Oil & Motion Picture Mktg. | 66,000.00 |
| Yacht and Airplane | 59,159.68 |
| Pacific National Bank | 4,750,000.00 |
| Claims Payable | 26,821,000.00 |
| Total | $34,368,768.71 |

## CONCLUSION

Having reached a conclusion on the total judgment amount, we still face the issue whether it will enter in full against all defend-

ants, or otherwise. Certainly the entire judgment should enter against the three members of the Bloom family. They treated Dome as their private treasury. They obviously acted together, one for all and all for one. The combined failure of each of them to carry out his or her respective responsibilities is what created the climate for the entire scheme. If only one of them had blown the whistle, these events would not have occurred.

While it is only a pro forma matter, we will, however, only enter judgment against IFS for the sums shown to have been transferred to it.

## JUDGMENT

THIS MATTER came on for a hearing on March 27, 1985. The defendants had been declared in default for failure to comply with various orders of the Court. The Court having heard the evidence, and filed its Memorandum Opinion of even date herewith, now therefore it is

ORDERED AND ADJUDGED:

THAT judgment be entered in favor of the Receiver of Dome Insurance, Inc., and against all the defendants, jointly and severally, in the sum of $1,261,185.73 and against the individual defendants, jointly and severally, in the additional sum of $33,107,582.98.

## APPENDIX

### INTERNATIONAL
### FINANCIAL SERVICES, LTD.
*Correspondent Office*

TELEX 902-256
INFIS DOME RDG

P.O. BOX 439
READING, PA 19603
(215) 372-4793

August 12, 1981

## MEMORANDUM

TO:     Philip & Cindy          FOR YOUR EYES ONLY!

FROM:   Leo

RE:     Cash advances from company to principals
        (Cindy, Phil or Leo)

I suggest the following when it is desired that funds be advanced to any of the three mentioned names and that the procedure be mandatory.

1. No one in the company is to have direct or indirect knowledge of any such cash or fund transfer. The activities of the principals must be kept confidential and not made known to ANY employee.
2. Such transfers are to be made to International Financial Services, Ltd. or to cash and the endorsement on the check should be International Financial Services, Ltd. by Leo Bloom. This method can be used on the Island or anywhere else, and Phil and Cindy can sign my name as endorser on checks so issued. The purpose of this is to have no known transfer from company funds to Philip or Cindy as officers of the Company, and also possibly expose them to tax consequences.
3. For example, should Cindy or Phil require cash or a deposit for their personal accounts in order to pay obligations of any kind, the funds should appear to come from another source, not the Company.
4. In order to facilitate this I suggest that you open an account on the Island in the name of International Financial Services, Ltd. and you sign my name as the signatory. You can then, by signing my name, draw funds through this account, thereby accomplishing the transfer without a conflict of interest.

   From an accounting standpoint, you will be receiving funds from International Financial Services, Ltd. and not from Dome. This is not fool-proof but better than the present method you are using.

Only withdrawals for pay should show on your books. All other handling of funds should be done in the way I suggest.

LB:dmk